**CV 13-4056**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RAFAEL NUNEZ,

Index No.: **KUNTZ, J.**
Purchased:

Plaintiff,

**VERIFIED COMPLAINT**

- against -

**JURY TRIAL
DEMANDED**

THE CITY OF NEW YORK,
THE NEW YORK CITY POLICE DEPARTMENT,
RAYMOND KELLY, Police Commissioner of
New York City in his official and individual capacities,
UNDERCOVER POLICE OFFICER C0079
DETECTIVE DIMITRIO ROIDIS, NYPD
DETECTIVE STEPHEN JONES, NYPD
POLICE OFFICERS John Does

**BLOOM, M.J.**

Defendants.
------------------------------------------------------------X

Plaintiff Rafael Nunez, by his attorneys, Ebanks & Sattler, LLP, in his Complaint (the "Complaint") herein against The City of New York, The New York City Police Department (the "NYPD"), New York City Police Commissioner Raymond Kelly, Undercover Police Officer C0079 of the NYPD, Detective Dimitrio Roidis of the NYPD, Detective Stephen Jones of the NYPD and NY Police Officers John Does 1-10 (collectively, the "Defendants"), allege as follows:

## NATURE OF THE ACTION

1. Plaintiff, Rafael Nunez, was sitting in front of his apartment building on a hot summer afternoon on July 24, 2010, when he was approached by an undercover police officer who proceeded to arrest him. When searched, the only things found on him were keys, a wallet and 40 dollars. Mr. Nunez did not know why he was being arrested, as he was a small business owner

working out of his apartment making empanadas and selling them to local restaurants. He was later to find out that he was identified as a "lost subject" by an undercover police officer that he never met who claimed that Mr. Nunez had been an intermediary in a drug sale three weeks earlier but had not been arrested as part of a "long-term" investigation. He was termed a "lost subject," even though the undercover officer claimed to have sought him out at his home address to arrange the drug purchase.

2. Despite the fact that not a single shred of evidence directly linked Plaintiff to a drug transaction apart from the undercover officer's account, and numerous inconsistencies in the arrest record, he was eventually indicted for Criminal Sale of a Controlled Substance and Criminal Facilitation. He was also reported to the INS for possible deportation. As a result of the combination of the immigration hold and his lack of $15,000 to post bond, he was incarcerated for nearly 2 years until his acquittal of all charges after a jury trial in February 2012.

3. During his 18 months of incarceration, Mr. Nunez lost all his worldly possessions: clothes, furniture, apartment and business equipment. He was threatened with deportation during his arrest and transferred for a time to the custody and control of the INS. Upon acquittal he was homeless, penniless and suffering from physical and psychological trauma.

4. The facts surrounding the arrest are so inconsistent in their description, and the process leading to the arrest so improper in its execution, that upon close scrutiny of the evidence one comes to the conclusion that this involves a case of conspiracy, false arrest and malicious prosecution. What happened to Mr. Nunez should not be allowed to occur to anyone in a democratic society governed by the rule of law. It is the nightmare scenario of being arrested while doing nothing wrong by someone one has never seen based on a single accusations that supposedly occurred weeks before that lacks independent confirmation and material evidentiary

support. It is to grant to a single individual in law enforcement the power to take another's freedom, the most sacred right guaranteed by our constitution, based on his word alone with a complete disregard for the supporting evidence that must accompany a police investigation and arrest. And, past the police, a prosecutor that accepted to pursue such a case with reckless disregard for lack of evidence and an implicit acquiescence in leaving out inconsistencies in the arrest record that would have made plain that the allegations against Plaintiff were unfounded.

## JURISDICTION AND VENUE

5. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1343(a). This Court may exercise supplemental jurisdiction over the claims based on New York law pursuant to 28 U.S.C. §1367.

6. Venue is proper under 28 U.S.C. § 1391 in the Eastern District of New York because the claims alleged herein arose there and, on information and belief, all parties hereto reside in the District.

## PARTIES

**I.     The Plaintiff**

7. Plaintiff, Rafael Nunez, is a natural person, 58 years old, residing at 3251 94th Street, Queens, New York. He was a resident of New York City during all relevant times of this action.

**II.    The Defendants**

8. Defendant City of New York, is a corporate entity and may sue and be sued in its corporate name.

9. Defendant the New York City Police Department is charged, *inter alia,* with the administration, operation and supervision of New York City police officers and their respective policing activities and operations.

10. Defendant Raymond Kelly is the duly appointed Police Commissioner for the City of New York and has been so at all times relevant to this Complaint. He is and has been responsible for the promulgation and implementation of police policies, procedures and practices in the City of New York.

11. Defendant Undercover Police Officer C0079, who is a natural person and a duly appointed police officer in the New York City Police Department, at all times relevant to the Complaint.

12. Defendant Detective Stephen Jones who is a natural person and a duly appointed police detective in the New York City Police Department, with shield number 0790 at all times relevant to the Complaint.

13. Defendant Detective Dimitrio Roidis who is a natural person and a duly appointed police detective in the New York City Police Department, with shield number 7470 at all times relevant to the Complaint.

14. Defendants John Does and others not presently known to the Plaintiff were, at all times material to this Complaint, duly appointed City of New York police officers of unknown rank.

## FACTUAL ALLEGATIONS

**I.   Background**

15. Plaintiff is a legal resident of the United Sates and has lived in this country for approximately 21 years. In 2010, in order to be self sufficient and rise from poverty, he started a

home-based empanada business; the success of which took him by surprise. His empanadas were unique in that they were made of yuca root (cassava), a starchy tuber eaten widely in Central and South America, and therefore well known in the Latin American community of Queens where he lived. There were no others making such empanadas and Plaintiff's business expanded to a distribution to 3 restaurants and he was employing 3 part-time workers and had saved enough to buy several bicycles for deliveries and a grinding machine for the yuca. In order to market his business to new restaurants Plaintiff produced business cards that contained his business name "Mama Delores Empanadas" with his cell number.

16. A few weeks before his arrest, as he was entering his apartment, Plaintiff was stopped and frisked by undercover officers that failed to identify themselves. He did not know if he was being assaulted by thugs or searched police officers. They patted him down, checked his wallet and took some of his business cards. Thereafter, he began receiving what he considered to be prank phone calls asking for empanadas initially and then inquiring about drugs. He would hang up on these calls insisting that they not harass him but they continued.

17. On July 24, 2012 Plaintiff took his stool and sat outside his apartment for some fresh air. Soon thereafter he saw a car park in front of him. A plainclothes police officer, Detective Stephen Jones, approached and proceeded to arrest him. He was asked if he had drugs, he said no and a search found only keys, a wallet with a NYS photo ID and $40 in cash.

18. Plaintiff was eventually indicted for a crime that had allegedly taken place over three weeks earlier on June 30th and consisted of criminal sale of a controlled substance in the third degree and criminal facilitation in the fourth degree. According to an undercover police officer (U/C C0079), the only person to identify and call for Plaintiff's arrest, the following incredible scenario occurred (Defendant denies these events):

19. U/C C0079 testified that on June 30th, 2010, he was given a phone number and a name "Nacho" as part of that day's tactical plan. He allegedly called the number had a "small conversation" with the person who answered (Tr. P 73) and he drove to an apartment on **35-14 94th Street in Queens**. Upon arriving at the address he called again and went to a first floor window, where he claims he met Plaintiff for the first time. He then asked if he sold cocaine and Plaintiff allegedly went out of his apartment and received $60 in pre-recorded buy money from the U/C C0079. Plaintiff made a call as they walked in the street and a few blocks later they came to an apartment building **35-61 92nd Street, Queens.** U/C C0079 waited in the lobby area and plaintiff went towards the back of the building met with somebody that U/C C0079 called JD Dealer, made the exchange came back with two Ziplock packs of cocaine and each went their separate ways.

20. Although this was a "buy and bust" operation, at some point on the spot it was converted to a "long-term" investigation and the seller, allegedly Plaintiff, was allowed to walk away without being arrested. There is no explanation as to who gave the order to make it a "long-term investigation." In the end it is clear that this was neither a buy and bust nor a long term investigation as none of the normal protocols of either type of investigation were followed through.

21. The pre-recorded buy money was never recovered and the details of this operation were not recorded in the memo books of tactical team members present that day. There was no independent identification of the suspect known a JD Nacho by any other police officer that was part of the operation on the day in question. The name of Plaintiff was never inquired or made a part of the record of this operation, despite the fact that U/C C0079 had his cell number and place of residence and supposedly interacted with him on the phone and in person for an

extended period of time. The police never attempted to wiretap the phone in order to gain information on "JD Dealer."

22. The Property Clerk Invoice for the drugs allegedly purchased from Plaintiff by U/C C0079 show that two clear ziplocked bags of cocaine were invoiced on June 30, 2010 by U/C C0079. In "Owner of Property" field of the form the aliases "JD Nacho and JD Dealer" appear, in the address field of the form is written "Unknown". On the very day of the event, when his recollection and detailed information should have been most clear and fresh, U/C C0079 failed to put a name or address that would link this drug purchase to Plaintiff.

23. A full twenty four days after June 30th, on July 24th, 2010, U/C C0079 was coincidentally parking his car when he saw Plaintiff in front of his building and called in the arrest, terming him a "lost subject."

24. The arresting officer on July 24 was Detective Dimitrio Roidis, who was also part of the tactical operation team on June 30th, the day of the supposed drug purchase. Despite having been present on BOTH dates, Detective Roidis in drafting the criminal complaint wrote that the drug sale for which Plaintiff was being arrested took place at the address of Plaintiff's apartment **35-14 94th Street in Queens,** NOT at **35-61 92nd Street, Queens** where the supposed supplier had produced the drugs. Detective Roidis testified that this was the address he had been given by U/C C0079. Moreover, when asked to look over his memo book to see if he could explain the mistaken drug sale address, he testified that *neither* address appeared in his memo book for the day in question, June 30, 2012. He testified that on that date the tactical team that included U/C C0079 had gone to at least 3 places and that, despite acknowledging that the location of a drug transaction would be a "significant aspect" of an undercover operation that he would want to

write down, neither of the addresses specified by UC0079 as involving Plaintiff in a drug transaction appeared in his memo book (Tr. 181-185).

25. The sworn testimony of Detective Dimitrio Roidis, which formed the basis for the Grand Jury indictment, states as follows: "Dimitrio Roidis …being duly sworn, deposes and says that on or about June 30, 2010 at or about 4:58 PM, *inside of 35-14 94th Street* County of Queens State of New York Defendant committed the offense of : Criminal Sale of Controlled Substance…" (emphasis added). There is no mention of the second address or of a second "dealer."

26. The recollection of events by U/C C0079 is suspect in both the alleged actions of the accused as well as those of the police officers. The record of arrest and investigation is riddled with incredible allegations, internal contradictions and misstatements sufficient to lead to a conclusion of fabrication as it relates to appellant. In summary, U/C C0079 claims that as a complete stranger, he called and then approached an alleged drug dealer in his home and convinced him to contact his supplier and walk him over to that supplier in the middle of a busy day when he was working his empanada business, all for a $60 purchase. Although he claims to have called ahead of time, spent up to 15 minutes engaged with him through his apartment window and another 5 to 15 minutes walking and waiting for the purchase, he never asked him his name. When asked if he had ever attempted to contact Plaintiff after the day of the drug transaction as part of a "long term investigation," U/C C0079 testified that he tried calling him several times but he never answered the phone. There is no explanation as to why he didn't simply go visit him directly as he had done the first time.

27. The evidence adduced at trial focused on the testimony of U/C C0079, the cell phone number of Plaintiff that was noted in a tactical report and tied to his cell phone, and evidence of

bags containing 0.636 grams of cocaine that were vouched for a transaction that took place on June 30, 2010.

28. Reviewing these three items separately one is struck to find that the testimony of U/C C0079 has absolutely no corroborating evidence beyond his personal recollection and an identification that took place nearly a month after the alleged drug transaction. The cell phone number was tied to a "JD Nacho" a name or nickname that has no connection or relevance to Plaintiff, even as a reference to his business which was selling empanadas. Moreover, the expert that came to testify as to the phone number on behalf of Metro PCS could only confirm that the phone number was in fact appellant's cell number. A fact that was not in dispute and that confirms appellant's testimony that from the time he was frisked by undercover officers who took his business cards, he had been receiving harassing calls to that number. However there were *no phone records* regarding calls, incoming or outgoing, to this cell phone that could tie him to U/C C0079, because the timeframe that the phone company holds such records (6 months) had expired. Finally the drugs that were vouched had no connection with Plaintiff. No fingerprints, no photographs showing Plaintiff handing them to the undercover, no contemporaneous recording of the transaction by other police officers on the same task force on the day in question.

29. During the darkest period of Plaintiff's ordeal his privately paid attorney, Mahmoud Rabah, whom his family had retained despite their modest means, recommended that Plaintiff plead guilty. He was soon fired by Plaintiff because he could not accept that a person hired to advocate his innocence would ask him to lie and plead guilty. Similarly, as part of his defense proceedings, at one point, before Judge Fernando Camacho, Judge Camacho advised Plaintiff to consider a guilty plea and he would get time served (as he had been in imprisoned for over a year

at this point). Judge Camacho explained that he would likely be deported regardless of the outcome of the case given the seriousness of the charges and that he would at least finish his time in jail immediately. But Plaintiff refused to plead guilty. His position to his attorney and to Judge Camacho was that he would never plead guilty to a crime he did not commit. He preferred to remain in prison than to do so. The jury trial vindicated Plaintiff in his belief of the justice system and in his knowledge of his innocence.

29.     The consequences of this case are far-reaching in their implications for the potential abuse of power and the erosion of individual freedoms and due process. If the criminal justice system allows for a person to be arrested and convicted under these circumstances the doors are open for a miscarriage of justice and the potential for error or even malice is substantially increased.

30.     The facts adduced at trial show a lack of probable cause on the part of the police to arrest and an intentional disregard for proof on the part of the prosecution that amounts to malicious prosecution. Even the term used as a justification for the arrest, "lost subject," is grossly misplaced. In this context, this is a perversion of the word "lost." In this sad course of events what was truly lost was never Plaintiff; instead what was lost was Plaintiff's liberty, his business, his worldly possessions. This loss led to a trampling of his dignity, his civil and human rights and due process of law.

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**

**VIOLATIONS OF 42 U.S.C. 1983:
FALSE ARREST AND IMPRISONEMENT**
(Fourth and Fourteenth Amendments of the U.S. Constitution)

31. Plaintiff restates and realleges Paragraphs 1 through 30 as though fully set forth herein.

32. Acting under color of law, Defendants denied Plaintiff's rights, privileges or immunities secured by the United States Constitution or by Federal Law, to wit:

33. Defendants Officers imposed by force or threats an unlawful restraint upon Plaintiff's freedom. The arrest was effectuated by way of a single description by a single undercover officer almost a month after the initial alleged encounter. These facts have been held by the Court to be highly questionable and likely insufficient to sustain an arrest because they would lack probable cause. U.S. v. Viscioso 711 F. Supp. 740, (1989).

34. As a result of their concerted unlawful and malicious detention and confinement of Plaintiff, the undercover and arresting police officers deprived Plaintiff of his right to his liberty without due process of law and his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. sec. 1983.

## SECOND CAUSE OF ACTION

### VIOLATIONS OF 42 U.S.C. 1983: CONSPIRACY

35. Plaintiff restates and realleges Paragraphs 1 through 34 as though fully set forth herein.

36. As a result of the concerted unlawful and malicious conspiracy of the undercover and arresting police officers, Plaintiff was deprived of his liberty without due process of law and his right to equal protection under the law. The due course of justice was impeded in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. sec. 1983 and 1985.

## THIRD CAUSE OF ACTION

## VIOLATIONS OF 42 U.S.C. 1983:
## REFUSING OR NEGLECTING TO PREVENT UNLAWFUL CONDUCT

37. Plaintiff restates and realleges Paragraphs 1 through 36 as though fully set forth herein.

38. At all times relevant to this complaint Defendants police officers of the NYPD were acting under the direction and control of Defendant Police Commissioner Raymond Kelly and the Defendant City of New York.

39. Acting under color of law and pursuant to official policy or custom, Police Commissioner Raymond Kelly and the City of New York knowingly, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis Defendant police officers in their duties to refrain from:

>(a) unlawfully and maliciously harassing a citizen who was acting in accordance with his constitutional and statutory rights, privileges and immunities
>(b) unlawfully and maliciously arresting, imprisoning and prosecuting a citizen who was acting in accordance with his constitutional and statutory rights, privileges and immunities
>(c) conspiring to violate the rights, privileges and immunities guaranteed to Plaintiff by the Constitution and laws of the United States
>(d) otherwise depriving plaintiff of his constitutional and statutory rights, privileges, and immunities

40. As a direct and proximate cause of the negligent and intentional acts of Defendants as set forth above, Plaintiff suffered physical injury, loss of income, and severe mental anguish in connection with the deprivation of his constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 USC sec 1983.

## FOURTH CAUSE OF ACTION

## MALICIOUS PROSECUTION
(Fourth and Fourteenth Amendments of the U.S. Constitution)

41. Plaintiff restates and realleges Paragraphs 1 through 40 as though fully set forth herein.

42. Defendants instituted criminal process against plaintiff with malice as the charges were not based on probable cause, that is, the state of the facts in the mind of the prosecutor would not lead a man of ordinary caution and prudence to believe, or entertain an honest or strong suspicion that Plaintiff was guilty.

43. Defendant City of New York, through its prosecutorial representatives, had a duty to ascertain whether there was reasonable and probable cause for a prosecution, to wit, to ascertain the allegations of the undercover police officer beyond an identification of Plaintiff, nearly a month after the alleged transaction, without further connection, proof or evidence prior to proceeding to an arrest and prosecution.

44. The Court of Appeals of New York has stated "The essence of malicious prosecution is the perversion of proper legal procedures" Broughton v State of New York, 37 NY2d 451 (1975). Moreover, despite the fact that a Grand Jury indictment creates a presumption of probable cause that the suspect committed the crime, that presumption can be overcome by a showing "that that conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures. Hernandez v. State of New York, 228 AD2d 902, 904 (1996). The presumption may also be overcome by a showing that the police failed "to make further inquiry when a reasonable person would have done so" and that failure "may be evidence of lack of probable cause to arrest." Malice may be shown by proof that probable cause was lacking or that the conduct was reckless and grossly negligent. Haynes v City of New York, 29 A.D. 3d 521 (2006)

## FOURTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

45.  Plaintiff restates and realleges Paragraphs 1 through 44 as though fully set forth herein.

46.  Defendants intentionally and deliberately inflicted emotional distress on Plaintiff by maliciously prosecuting him, or by abusing the lawful process by unlawful purpose, or by violating Plaintiff's constitutional rights, or by falsely arresting and imprisoning Plaintiff, in a way that they knew or should have known that emotional distress was the likely result of their conduct.

47.  The actions of defendants were the cause of Plaintiff's distress

The emotional distress sustained by Plaintiff was and is severe and of a nature that no reasonable man could be expected to endure.

48.  As a result of Defendant's extreme and outrageous conduct, Plaintiff has suffered and will continue to suffer mental pain and anguish, severe emotional trauma, embarrassment, and humiliation.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE

49.  Plaintiff restates and realleges Paragraphs 1 through 48 as though fully set forth herein.

50.  Defendant City of New York and Police Commissioner Raymond Kelly owed a duty to supervise or train the officers and to take steps to prevent events such as occurred here, to wit, the false arrest and imprisonment and the swearing to charges without probable cause.

51. Defendants Police Officers owed a duty to act according to the standard of ordinary care of a police officer, to wit, to conduct a proper investigation, the failure of which was the proximate cause of Plaintiff's injuries.

52. Defendants City of New York and Police Commissioner Raymond Kelly breached that duty by failing to adequately control and supervise the officers.

53. As a result of those breaches, which were the proximate causes of Plaintiff's injuries, Plaintiff suffered harm and damages.

54. Defendants City of New York and Police Commissioner Raymond Kelly are also liable under the doctrine of respondent superior.

## SIXTH CAUSE OF ACTION

### NEGLIGENCT INFLICTION OF EMOTIONAL DISTRESS

55. Plaintiff restates and realleges Paragraphs 1 through 54 as though fully set forth herein.

56. Defendants negligently inflicted emotional distress on the Plaintiff

57. Defendants had a continuing affirmative duty to perform their professional services in such a manner as not to inflict distress on plaintiff

58. Defendants breached their duties to plaintiff

59. The Plaintiff never interfered with defendant's duties under the above described duties

60. Plaintiff is and, and with a high degree of likelihood, will continue to be inflicted with emotional distress due to the negligence of defendants.

61. Defendants City of New York and Police Commissioner Raymond Kelly are also liable under the doctrine of respondent superior.

62.   Ass a result of the Defendants' negligent conduct, Plaintiff has suffered and will continue to suffer pain, anguish, severe emotional trauma, embarrassment and humiliation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

1. Award Plaintiff compensatory damages in the amount of $5,000,000 against the individual defendants and the City of New York, jointly and severally, together with interest and costs;

2. Award Plaintiff punitive damages in the amount of $2,000,000 against the individual defendants, jointly and severally;

3. Award Plaintiff reasonable attorneys fees and costs as authorized under 42 U.S.C. §1988; and

4. Grant such other further and different relief as the Court deems just and proper.

**WHEREFORE**, Plaintiff demands judgment, including interest, jointly and severally against Defendants in an amount deemed by this Court to be just and fair and in any other way that the Court deems appropriate.

Dated: New York, New York
      July 16, 2013

EBANKS & SATTLER, LLP

ADAM SATTLER
Attorneys for Plaintiff
20 Vesey Street, Suite 503
New York, New York 10007
(212) 766-4411

## ATTORNEY'S VERIFICATION

MARIO A. VASQUEZ, an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under the penalties of perjury:

I am Of Counsel with the law firm of **EBANKS & SATTLER, LLP**, I have read the annexed **SUMMOMNS AND COMPLAINT** and know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files. The reason this verification is made by me and not Plaintiff is that Plaintiff does not reside in the county wherein I maintain my office.

DATED:   New York, New York
         July 16, 2013

_____
ADAM SATTLER